**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-02522-NYW-SBP

DAVID COLOMBIA, and
ALISA COLOMBIA,

      Plaintiffs,

v.

EXPERIAN INFORMATION SOLUTIONS, and
SENTRY CREDIT, INC.,
      Defendants.

---

## ORDER

---

This matter is before the Court on the Defendant Experian Information Solutions, Inc.'s ("Defendant" or "Experian") Motion to Compel Arbitration and Supporting Memorandum of Law ("Motion" or "Motion to Compel Arbitration"), [Doc. 36, filed January 24, 2025].[1]  Plaintiffs responded, [Doc. 43, filed February 14, 2025], and Experian replied, [Doc. 44, filed February 18, 2025].  Therefore, the Motion is ripe for review.  For the reasons set forth herein, the Motion to Compel Arbitration is respectfully **GRANTED**.

### BACKGROUND

I.  **Procedural Background**

On September 13, 2024, Plaintiffs David Colombia ("Mr. Colombia") and Alisa

---

[1] When referring to documents filed in this action, this Court uses the convention [Doc. __], referring to the docket and page number assigned by the Court's Electronic Court Filing ("ECF") System.  When referring to documents filed in another matter, this Court uses the convention [ECF No. __], still referring to the docket and page number assigned by the ECF System.

Colombia ("Ms. Colombia" and collectively with Mr. Colombia, "Plaintiffs") filed a complaint and jury demand, bringing five claims against Experian, Sentry Credit, Inc. ("Sentry"), and Trans Union LLC ("Trans Union").[2] [Doc. 1 at 28–33]. As is pertinent here, Plaintiffs brought two claims against Experian, namely one under 15 U.S.C. § 1861e(b) for failure to follow reasonable procedures to assure maximum possible accuracy, and one under 15 U.S.C. § 1861i for failure to perform a reasonable reinvestigation. [Doc. 1 at 28–31]. In response, Experian filed an answer, [Doc. 7], and subsequently filed the instant Motion to Compel Arbitration under the Federal Arbitration Act ("FAA"), seeking an order compelling all claims against Experian into arbitration based on an arbitration agreement signed by Plaintiffs, [Doc. 36 at 1]. Plaintiff responded in opposition. [Doc. 43]. The case is currently stayed pending resolution of the instant Motion. [Doc. 49].

## II.    Factual Background

Plaintiff Alisa Colombia enrolled in a credit monitoring service called CreditWorks on September 27, 2020, and Plaintiff David Colombia enrolled in CreditWorks on October 7, 2020. [Doc. 37 at 3 ¶ 3]. Both enrollments occurred prior to the commencement of this litigation. *See* [Doc. 1]. Plaintiffs had to complete a webform to enroll in CreditWorks. [Doc. 37 at 3 ¶ 3]. These facts appear to be undisputed. *See generally* [Doc. 43].

In support of the Motion, Experian has submitted the Declaration of Dan Smith

---

[2] The Parties stipulated to the dismissal of Trans Union on November 20, 2024. [Doc. 24; Doc. 25]. Sentry has not joined in the instant Motion to Compel Arbitration. Therefore, the Motion and this Order pertain only to Plaintiffs' claims against Experian. The Court notes that Sentry has filed two Answers that appear to the Court to be identical. *See* [Doc. 23, filed November 18, 2024; Doc. 26, filed November 26, 2024]. Concurrently with this Order, the Court will issue a separate Order to Show Cause as to why the Answer filed on November 26, 2024, [Doc. 26], should not be stricken as duplicative of the Answer filed on November 18, 2024, [Doc. 23].

("Mr. Smith") to provide evidence regarding the webform, the enrollment process, and Experian's relationship with its affiliates.  [Doc. 37].  Experian is an affiliate of ConsumerInfo.com, Inc. ("ConsumerInfo").  [*Id.* at 3 ¶ 2].  ConsumerInfo also does business as Experian Consumer Services ("ECS").  [*Id.* at 2 ¶ 1].  Both Experian and ConsumerInfo are wholly-owned subsidiaries of Experian, Holdings, Inc., and their parent company is Experian plc.  [*Id.* at 3 ¶ 2].  Experian provides credit information and monitoring through the CreditWorks service.  [*Id.* at 5 ¶ 8].

The CreditWorks webform required Plaintiffs to enter their personal information, including their names, addresses, phone numbers, and email addresses.  [*Id.* at 3 ¶ 3].  After entering that information, Plaintiffs had to click a purple "Create Your Account" button on the webform to enroll.  [*Id.*]; *see also* [*id.* at 8].  The following disclosure was immediately below the boxes where Plaintiffs entered their email addresses and passwords:  "[b]y clicking 'Create Your Account': I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy."  [*Id.* at 3 ¶ 3].  The phrase "Terms of Use Agreement" in the disclosure was hyperlinked and offset in bold blue text.  [*Id.* at 3 ¶ 4].  Before clicking the "Create Your Account" button, Plaintiffs could have viewed the entire text of the Terms of Use Agreement by clicking on the bolded blue "Terms of Use Agreement" hyperlink.  [*Id.*].  If Plaintiffs had clicked on that hyperlink, an additional window would have opened within their web browsers that contained the entire text of the Terms of Use Agreement.  [*Id.* at 4 ¶ 4].  The webform, disclosure, purple "Create Your Account" button, and bolded blue Terms of Use hyperlink all appeared on a single webpage.  [*Id.*].

After entering their information, Plaintiffs clicked the "Create Your Account" button.

[*Id.* at 4 ¶ 5]. Plaintiffs would not have been able to enroll successfully in CreditWorks unless each clicked that button when they enrolled. [*Id.*]. Plaintiffs continuously used the service from their respective dates of enrollment, including use of the service after the version of the Terms of Use in effect at the time they filed this lawsuit came into effect. [*Id.*].

The Terms of Use Agreement in effect when Plaintiffs enrolled in CreditWorks is attached as "Exhibit 2" to Mr. Smith's Declaration. [*Id.* at 4 ¶ 5; *id.* at 9]. The Terms of Use Agreement in effect when Plaintiffs filed this lawsuit is attached as "Exhibit 3" to Mr. Smith's Declaration. [*Id.* at 4 ¶ 5; *id.* at 52]. The Terms of Use Agreement that was in effect when Plaintiffs enrolled in CreditWorks contained an Arbitration Agreement ("the 2020 Arbitration Agreement") that required a party to arbitrate all claims against "ECS" that "relate to" or "arise out of" membership in CreditWorks:

> ECS and you agree to arbitrate all disputes and claims between us arising out of this Agreement directly related to the Services or Websites to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration. This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us directly relating to the provision of any Service and/or your use of any Website subject to arbitration to the fullest extent permitted by law. **The agreement to arbitrate includes, but is not limited to: claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, whether based in contract, tort, statute (including, without limitation**, the Credit Repair Organizations Act) fraud, misrepresentation or any other legal theory; claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

[*Id.* at 16 (emphasis added)]. The Terms of Use Agreement, revised September 13, 2024 (the "2024 Arbitration Agreement," and collectively with the 2020 Arbitration Agreement,

"Arbitration Agreements"), that was in effect when Plaintiffs filed the instant lawsuit contains a similar agreement:

> ECS and you agree to arbitrate all disputes and claims between us that arise out of or relate to this Agreement, which includes any Information you obtain through the Services or Websites, to the maximum extent permitted by law, except any disputes or claims which under governing law are not subject to arbitration.  For purposes of this Arbitration Agreement, the term "Information" means any credit, personal, financial or other information delivered to you as part of, or in conjunction with, the Services, including any such information that may be archived to the extent made available on the Websites, including (i) for your purchase of non-membership based Services such as the 3 Bureau Credit Report and FICO® Scores, the FICO Industry or other Base FICO Scores and/or an Experian Credit Bureau Credit Report and FICO Score, (ii) enrollment and use of free Services (such as EXPERIAN CREDITWORKS Basic), and/or enrollment, purchase and use of membership based Services (such as EXPERIAN CREDITWORKS Premium, Experian IdentityWorks, or Experian Credit Tracker); and (iii) your access to and use of calculators, credit resources, text, pictures, graphics, logos, button items, icons, images, works of authorship and other information and all revisions, modifications, and enhancements thereto contained in the Websites.
>
> **This agreement to arbitrate is intended to be broadly interpreted and to make all disputes and claims between us relating to, or arising out of, this Agreement, any Service and/or Website**, including any Information you obtained through the Services or Websites, subject to arbitration to the fullest extent permitted by law.  The agreement to arbitrate includes, but is not limited to, claims brought by you against ECS, whether based in contract, tort, statute (including, without limitation, the Fair Credit Reporting Act and the Credit Repair Organizations Act), for fraud, misrepresentation or any other legal theory; claims arising out of or relating to any aspect of the relationship between us arising out of any Service or Website, claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising); claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and claims that may arise after the termination of this Agreement.

[*Id.* at 66–67 (emphasis added)].  Both Terms of Use Agreements define "ECS" to include its "affiliates."  [*Id.* at 4 ¶ 6]; *see also* [*id.* at 16 ("For purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities,

subsidiaries, affiliates"]; *see also* [*id.* at 54 ("The term 'ECS' means ConsumerInfo.com, Inc., an Experian ® company (also known as Experian Consumer Services) and referred to as 'Experian' on the Websites, its predecessors in interest, successors and assigns, [and] affiliates (including, but not limited to, Experian Information Solutions, Inc.)")]. Experian has been an affiliate of ECS during the entire time Plaintiffs have been enrolled in CreditWorks.  [*Id.* at 4 ¶ 6].

Every version of the Terms of Use Agreement in effect during Plaintiffs' enrollment in CreditWorks has a section entitled "Amendments," [*id.* at 5 ¶ 7], that advises Plaintiffs that they would be bound by the then-current version of the Terms of Use Agreement each time they "order[ed], access[ed], or use[d]" any of the services or websites described in the Terms of Use Agreement, [*id.* at 13, 60].  During the period relevant to this litigation, Experian contributed to the services that CreditWorks subscribers received by providing regular access to how information appears in their Experian credit files, including changes to the information in those files.  [*Id.* at 5 ¶ 8].  The Terms of Use Agreement covers the provision of "Services," and that term is defined to include services to which Experian contributed as the provider of credit information, including CreditWorks, and providing "credit report(s), credit risk score(s), credit monitoring, credit score monitoring and credit score tracking (including all the data and information contained therein), the receipt of any alerts notifying [consumers] of changes to the information contained in [their] credit report(s)."  [*Id.* at 5 ¶ 8, 10, 54].

## LEGAL STANDARD

Arbitration is, at its core, a matter of contract.  *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986).  Courts "must rigorously enforce arbitration agreements according to their terms."  *Am. Express Co. v. Italian Colors Rest.*, 570 U.S.

228, 233 (2013) (quotation omitted).  In deciding a motion to compel arbitration, the Court uses a two-step analysis.  First, the Court must determine whether an agreement that provides the moving party with a right to compel arbitration exists.  *Cavlovic v. J.C. Penney Corp., Inc.*, 884 F.3d 1051, 1057 (10th Cir. 2018); *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 832 (10th Cir. 2023).  "The existence of an agreement to arbitrate is a threshold matter which must be established before the FAA can be invoked."  *Avedon Eng'g, Inc. v. Seatex*, 126 F.3d 1279, 1287 (10th Cir. 1997).  Second, the Court must consider whether the allegations in the complaint fall within the scope of that agreement.  *Cavlovic, Inc.*, 884 F.3d at 1057.  In other words, the Court must determine who is bound by the arbitration agreement and whether the agreement covers the dispute at issue.  *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009).

During the second step, the Court may also need to determine, under the terms of the arbitration agreement, whether issues regarding arbitrability must be decided by the arbitrator or by the Court.  *Brayman*, 83 F.4th at 832.  Parties can agree to arbitrate arbitrability.  *Id.* (quoting *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1280 (10th Cir. 2017)).  A presumption exists that courts, rather than arbitrators, decide such issues.  *Id.* However, that presumption can be overcome by a showing of "clear and unmistakable evidence" that the parties delegated arbitrability issues to an arbitrator, rather than to the court.  *Id.* (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  If such evidence exists and the parties delegated arbitrability issues to the arbitrator, the Court "possesses no power to decide the arbitrability issue."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 68 (2019).

When deciding a motion to compel arbitration, courts use a similar framework to

that which they use in deciding a motion for summary judgment. *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1261 (10th Cir. 2012). A motion to compel arbitration should only be granted "if there are no genuine issues of material fact regarding the parties' agreement" to arbitrate. *Id.* (quotation omitted). As in summary judgment practice, a court may consider evidence from the parties. *See, e.g.*, *Petrie v. GoSmith, Inc.*, 360 F. Supp. 3d 1159, 1161 (D. Colo. 2019) (considering the defendant's submission of the terms of use in a motion to compel arbitration). The initial burden to establish a valid agreement lies with the moving party. *Bellman v. i3Carbon, LLC*, 563 F. App'x 608, 612 (10th Cir. 2014). The burden then shifts to the nonmoving party "to raise a genuine dispute of material fact regarding the existence of an agreement." *Id.*

If the non-moving party opposes the motion to compel arbitration on the basis that there was no agreement to arbitrate between the parties, the Court gives to "the party opposing arbitration the benefit of all reasonable doubts and inferences that may arise." *BOSC, Inc. v. Bd. of Cnty. Comm'rs*, 853 F.3d 1165, 1177 (10th Cir. 2017) (quotation omitted). If the Court concludes that a valid arbitration agreement exists and that the dispute falls within the scope of the agreement, the FAA mandates a stay of the judicial proceeding. 9 U.S.C. § 3; *see also Nichols v. Google LLC*, No. 23-cv-01022-RMR-NRN, 2023 WL 5938917, at *2 (D. Colo. Sept. 12, 2023), *report and recommendation adopted*, 2023 WL 9232937 (D. Colo. Oct. 11, 2023).

## ANALYSIS

Experian argues that the Court should compel arbitration of Plaintiffs' claims for three reasons: (1) a valid arbitration agreement exists; (2) Experian is authorized to enforce the arbitration agreement; and (3) issues of arbitrability have been delegated to

the arbitrator under the arbitration agreement.  [Doc. 36 at 8–15].  Plaintiffs' counterarguments relate to Experian's first argument.  They argue that the Court should deny the Motion for two primary reasons:  (1) Experian's declarant Dan Smith lacks personal knowledge to establish a valid arbitration agreement; and (2) Experian has not demonstrated that Plaintiffs assented to such an agreement.  [Doc. 43 at 3].

For the reasons that follow, this Court respectfully concludes that this matter be compelled into arbitration.

## I.    Experian's Evidence in Support of the Motion is Sufficient

First, the Court addresses Plaintiffs' arguments asserting that Experian lacks sufficient evidence to demonstrate a valid arbitration agreement, referencing Mr. Smith's Declaration and the associated documents.  [Doc. 43 at 3–12]; *see* [Doc. 37].  Specifically, Plaintiffs argue that Mr. Smith lacks personal knowledge of the facts set forth in his Declaration and the documents attached to the Declaration.  [Doc. 43 at 3–12].

Under the Federal Rules of Civil Procedure, a "declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  Generally, "a witness may testify about a matter within his personal knowledge as long as there is 'evidence to prove personal knowledge, which may consist of the witness's own testimony.'"  *Wilmington Sav. Fund Soc'y FSB as Tr. of Residential Credit Opportunities Tr. III v. Hutchins*, No. 21-2094, 2022 WL 1087143, at *4 (10th Cir. Apr. 12, 2022)

(brackets omitted) (quoting Fed. R. Evid. 602).

Contrary to Plaintiffs' assertion that Mr. Smith "does not and cannot validate what appeared on" Mr. and Ms. Colombia's "unknown electronic device[s]," [Doc. 43 at 5], Mr. Smith's Declaration indicates that he has personal knowledge of the enrollment process that CreditWorks users go through to get access to the platform, as well as Mr. and Ms. Columbia's enrollment processes.   In his role as Director of Product Operations for ConsumerInfo, Mr. Smith's "duties . . . include supporting the consumer enrollment process into CreditWorks," which requires him to be familiar with "how consumers enroll, the forms they must complete to enroll, as well as the Terms of Use governing such services."  [*Id.* at 2 ¶ 1].  He further explains his "duties also require that [he is] familiar with ECS's electronic databases that store consumer enrollment information, including the webpages a consumer would have encountered to complete their enrollment into CreditWorks, the personally identifiable information entered when enrolling, which buttons the consumer would have clicked on in the enrollment process, and date and time of the consumer's acceptance of the Terms of Use."  [*Id.*].  Mr. Smith then confirms that "[t]he facts stated in this Declaration are of my own personal knowledge, including knowledge acquired in the course and scope of my job responsibilities and through the review of pertinent data and documents maintained as business records by ECS in the course and scope of ECS's business, including ECS's internal records that store CreditWorks account information."  [*Id.* at 3 ¶ 1].  Plaintiffs point to nothing in the factual record that contradicts his statements regarding his personal knowledge.  *See generally* [Doc. 43].

The weight of authority favors accepting Mr. Smith's Declaration.  [Doc. 44 at 6

(citing cases)].  *See, e.g.*, *Hanson v. Experian Info. Sols. Inc.*, No. 1:23-cv-4564-MHC-CMS, 2024 WL 2974160, at *3 (N.D. Ga. June 12, 2024) ("When presented with arbitration agreements in contracts formed online between Experian and consumers, courts routinely have relied on declaration testimony like that provided by [Mr.] Smith in this case to demonstrate how the consumer manifested assent to the company's arbitration provision." (collecting cases)), *report and recommendation adopted*, 2024 WL 3509482 (N.D. Ga. July 22, 2024).

The out-of-circuit case law relied upon by Plaintiffs does not persuade the Court otherwise.  [Doc. 43 at 8–11 (first citing *Austin v. Equifax Info. Servs., LLC*, No. 3:22-cv-00707, 2023 WL 8646275, at *3 (E.D. Va. Dec. 14, 2023), *rev'd sub nom.*, *Austin v. Experian Info. Sols., Inc.*, --- F.4th ---, 2025 WL 2177331 (4th Cir. Aug. 1, 2025); then citing *Newton v. Experian Info. Sols., Inc.*, No. 623-cv-00059-JRH, 2024 WL 3451895 (S.D. Ga. July 18, 2024), *rev'd*, No. 24-12398, 2025 WL 2102084 (11th Cir. July 28, 2025) (per curiam); and then citing *Lamonaco v. Experian Info. Sols., Inc.*, No. 6:23-cv-01326-PGB-LHP, 2024 WL 1703112, at *1 (M.D. Fla. Apr. 19, 2024), *rev'd,* 141 F.4th 1343 (11th Cir. 2025)].  Fundamentally, this Court is not bound by the determinations of other district courts.  *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case."); *United States v. Rhodes*, 834 F. App'x 457, 462 (10th Cir. 2020) ("district courts in this circuit are bound by [Tenth Circuit] decisions and those of the United States Supreme Court—they are not bound by decisions of other district courts").  Equally significant, all three district court rulings have now been reversed.  The United States Court of Appeals for the Eleventh

Circuit ("Eleventh Circuit") recently reversed both appeals before it.   In *Lamonaco v. Experian Info. Sols., Inc.*, 141 F.4th 1343, 1349 (11th Cir. 2025), the Eleventh Circuit reversed the district court and remanded with instructions to grant Experian's motion to compel arbitration.  In doing so, the Eleventh Circuit rejected the plaintiff's argument that the declaration was insufficient:

> Williams attested that Lamonaco enrolled in the CreditCheck Total service on February 16, 2020, and described the online enrollment process in detail. He asserted that he had personal knowledge based on internal business records that he reviewed. He attached the Terms of Use that Lamonaco agreed to, and he included screenshots depicting the pages Lamonaco encountered during enrollment.
>
> Lamonaco does not contest these facts. She does not deny enrolling, does not dispute the interface's description, and does not claim that the terms were concealed or misleading. Her objection is purely legal: that the declaration—unrebutted, signed under penalty of perjury, based on personal knowledge, and supported by documentation—is insufficient to establish an agreement by a preponderance of the evidence.
>
> We disagree. <u>A declaration that sets forth specific facts based on personal knowledge, describes the enrollment process, and appends the operative contract is competent evidence sufficient to satisfy Experian's initial burden.</u> *Cf.* 28 U.S.C. § 1746 (permitting unsworn declarations to substitute for affidavits if made under penalty of perjury). Williams's declaration and supporting exhibits made it "more likely than not" that Lamonaco agreed to the Terms of Use. *See S. Fla. Water Mgmt. Dist.*, 139 So. 3d at 872. And where, as here, the opposing party offers no factual rebuttal, the FAA and Florida contract law require no more to compel arbitration.

*Id.* at 1348 (emphasis added).  And in *Newton*, the Eleventh Circuit rejected the plaintiff's attempt to distinguish *Lamonaco*,[3] and reversed and remanded the case to the district court for further proceedings, holding:

> Further, the declaration produced by Experian's corporate officer in this case mirrored that produced in *Lamonaco*, which we held was sufficient. *Lamonaco*, __ F.4th at __, 2025 WL 1831283 at *4.  Specifically, the

---

[3] *Newton v. Experian Info. Sols., Inc.*, Case No. 24-12389, ECF No. 39 (11th Cir. July 18, 2025).

declarant described his position with the company, which involved being familiar with the enrollment process and Experian's business records that document consumers' use of their accounts. Based on his access of a consumer's records, he could confirm membership details such as date and time of enrollment, the Terms of Use they agreed to, and "the exact path the consumer encountered when completing their enrollment." He then recounted the date Newton enrolled and stated that she had to have completed two webforms in order to successfully enroll. On the second form, there was a disclosure stating that by clicking, she agreed to the Terms of Use Agreement, among other things. The declarant described how the Terms of Use were set off in blue text as a hypertext link to the Terms of Use document, which was located immediately above the "Submit Secure Order" button on the web form that Newton clicked in order to enroll. Both of these forms were included as exhibits to the declaration as were the Terms of Use in effect at the time of Newton's enrollment.

*Newton*, 2025 WL 2102084, at *3.

Plaintiffs' reliance on the district court's ruling in *Austin* fares no better. *See* [Doc. 43 at 8]. The Fourth Circuit recently reversed the district court and concluded that an Experian corporate officer had sufficient knowledge of "marketing, advertising and sales of [Experian's] consumer credit products, including services that consumer enroll [sic] in at Experian websites, as well as the Terms of Use governing such services" to submit a declaration about "whether and when Austin enrolled in CreditWorks, and if so, what terms of use, if any, did he agree to." 2025 WL 2177331, at *6. Even before the Fourth Circuit's ruling, this Court recently declined to follow *Austin* in a separate case in which the plaintiff challenged Mr. Smith's personal knowledge. *McGuire v. CarMax Bus. Servs. LLC*, No. 1:23-cv-02938-NYW-SBP, 2024 WL 3897073, at *13 (D. Colo. Aug. 16, 2024) ("[Plaintiff" argues in opposition that this court should be guided by *Austin* . . .), *report and recommendation adopted,* No. 23-cv-02938-NYW-SBP, 2024 WL 4027964 (D. Colo. Sept. 3, 2024). In *McGuire*, the Court distinguished the district court's ruling in *Austin* based on the declaration provided by Mr. Smith, observing that the declarant in *Austin*

neither indicated his personal knowledge of the system nor the documents upon which he based his knowledge. *Id.* (citing *Austin*, 2023 WL 8646275, at *4, *7). The Court further concluded that the district court's *Austin* appeared to be an outlier that the Court is not obliged to follow. *Id.*

Indeed, while the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") has not passed on this specific declaration, it has considered challenges to the personal knowledge of corporate declarants in analogous circumstances. In *Hancock*, the plaintiffs challenged the district court's reliance on declarations by corporate designees based on their personal knowledge of the standard practice for customer acceptance of terms of service in the context of a "clickwrap" agreement. *See Hancock*, 701 F.3d 1248, 1255 (10th Cir. 2012). The Tenth Circuit found that:

> The declarations are based on personal knowledge of the standard practice followed when customers generally acquire . . . services. Evidence of that standard practice is offered to support an inference about what happened when the individual Plaintiffs acquired [the service]. Once this evidence was offered in support of Defendants' motions, Plaintiffs had the opportunity to rebut it.

*Id*. at 1264 (10th Cir. 2012). Here, Mr. Smith's Declaration goes one step further to describe his review of membership enrollment data maintained in the regular course of business specific to Plaintiffs. [Doc. 37 at 3 ¶ 3]. Based on that review of the membership enrollment data, he attests that "[a]fter enrolling, Plaintiffs continuously used the service, including after the version of the Terms of Use in effect at the time they filed this lawsuit came into effect." [*Id.* at 4 ¶ 5].

The Court respectfully concludes that the evidence in Mr. Smith's Declaration is "sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602; *see also Hanson*, 2024 WL 2974160, at *4 (finding the same

with respect to a similar declaration Mr. Smith provided in that case); *see also Baker v. Experian Info. Sols., Inc.*, No. 24-cv-00605-TWP-MJD, 2024 WL 3082644, at *2 (S.D. Ind. June 20, 2024) ("Plaintiff's reliance on . . . *Austin* . . . proves weak, as [*Austin* is] currently on appeal to the Fourth . . . Circuit . . . [and] the Fourth Circuit[] ha[s] held that 'affidavits submitted by corporate representatives . . . are properly considered when the corporate representative expressly verifies that the matters stated therein are based on his own personal knowledge gained through review of business records.'"). Therefore, the Court may properly consider Mr. Smith's Declaration and associated exhibits in considering Experian's Motion to Compel. *See Hancock*, 701 F.3d at 1264.

## II.    A Valid and Enforceable Agreement Exists

The Court next considers whether an enforceable agreement to arbitrate exists between the Plaintiffs and Experian. Courts generally apply "'state-law principles that govern the formation of contracts' to determine whether a party has agreed to arbitrate a dispute." *Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 475 (10th Cir. 2006) (quoting *First Options*, 514 U.S. at 944). Here, both Experian and Plaintiffs rely on Colorado law in their briefs, and neither side suggests that any other state's law should apply. [Doc. 36 at 14, 19; Doc. 43 at 2]; *see also Hardin*, 465 F.3d at 475–76 (applying Oklahoma contract law where it was undisputed that Oklahoma law governed). The Court thus applies Colorado contract law in deciding the Motion.

Under Colorado law, a party assents to a contract's terms through "words or conduct that, when objectively viewed, manifests an intent to accept an offer." *Marquardt v. Perry*, 200 P.3d 1126, 1129 (Colo. App. 2008). "While assent may be implied from the totality of circumstances and the acts of the parties, it must appear in some form." *Vernon*

*v. Qwest Commc'ns Int'l*, 857 F. Supp. 2d 1135, 1149 (D. Colo. 2012) (citing *Mumm v. Adam*, 134 Colo. 493, 307 P.2d 797, 801 (1957)), *aff'd* 925 F. Supp. 2d 1185 (D. Colo. 2013).  "When evaluating assent in the context of email and the internet, 'the threshold issue is . . . did the consumer have reasonable notice, either actual or constructive, of the terms of the putative agreement and did the consumer manifest assent to those terms.'" *Macasero v. ENT Credit Union*, 533 P.3d 982, 988 (Colo. App. 2023) (quoting *Vernon*, 857 F. Supp. 2d at 1149).

Plaintiffs argue that an agreement did not exist, and even if one did exist, they did not validly assent to it.  [Doc. 43 at 12].  Specifically, Plaintiffs argue that the agreement in question is an online form, also called a "clickwrap agreement," [*id.*], which lacked sufficient notice to Plaintiffs that they assented, did not call attention to any arbitration agreement, and would not have led a reasonable consumer to believe they had waived their right to a jury trial, [*id.* at 12–15].  Experian replies that Plaintiffs have not identified any issues of fact to dispute contract formation, and that the evidence shows that Plaintiffs assented to the 2020 Arbitration Agreement at the time they registered for their accounts and every Terms of Use that was in effect during Plaintiffs' enrollment contains an arbitration agreement.  [Doc. 44 at 3–6].  This Court respectfully agrees.

The Tenth Circuit has routinely enforced online agreements where a user is required to acknowledge an agreement before using a website or creating an account and has also specifically concluded that such "clickwrap" agreements are valid and enforceable.  *See, e.g.*, *Hancock*, 701 F.3d at 1256.  In addition, under principles of Colorado contract law, courts in the District have concluded that clicking "accept" is sufficient to form a contract, even when the terms of such contract do not appear on the

same screen. *See, e.g., Nichols*, 2023 WL 5938917, at *3 (stating that a plaintiff "manifested his assent to the [a]rbitration [a]greement . . . when he clicked 'I accept' to the clickwrap agreement"); *Jovel v. TeamSnap, Inc.*, No. 1:24-cv-01906-CNS-TPO, 2025 WL 2161056, at *5 (D. Colo. July 30, 2025) ("Clicking the checkbox in the clickwrap agreement was a clear manifestation of [p]laintiff's assent to the [terms of service]." (citations omitted)); *Petrie*, 360 F. Supp. 3d at 1161 (stating that the defendant presented "reasonable notice of the arbitration agreement and that [the] [p]laintiff assented to that agreement" when the defendant clicked the box to indicate his agreement to the terms of use and privacy policy.).[4]

> As applied here, Plaintiffs clearly assented to the 2020 Arbitration Agreement when creating their CreditWorks accounts. Their respective acts of clicking on the purple "Create Your Account" button demonstrate their acceptance to the Terms of Use Agreement and the Arbitration Agreement contained therein. [Doc. 37 at 4 ¶¶ 4–5; *id.* at 8]. During the account creation process, Plaintiffs were informed that by clicking on the purple button, they were agreeing to the Terms of Use Agreement. [*Id.*]. Indeed, the Terms of Use Agreement was immediately available via a hyperlink in blue bolded text indicated on the same page. [*Id.* at 3–4 at ¶ 4; *id.* at 8–51]. The 2020 Arbitration Agreement was written in understandable, plain language, large, readable print, and was not obscured to the reader. [*Id.* at 15–16]; *see Grosvenor v. Qwest Corp.*, 854 F. Supp. 2d 1021, 1030 (D. Colo. 2012) (terms in a clickwrap agreement must be "sufficiently conspicuous" such that a reader can review the terms and assent to them if they choose).

---

[4] Although *Petrie* did not explicitly apply Colorado law, it relied on *Vernon*, which did apply Colorado law. *See Petrie*, 857 F. Supp. 2d at 1161; *Vernon*, 857 F. Supp. 2d at 1149.

Beyond the contractual language set forth above, the 2020 Arbitration Agreement contains a summary in all capitals, alerting the reader to its significance:

**DISPUTE RESOLUTION BY BINDING ARBITRATION**

PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.

SUMMARY:

MOST CUSTOMER CONCERNS CAN BE RESOLVED QUICKLY AND TO THE CUSTOMER'S SATISFACTION BY CALLING ECS'S CUSTOMER CARE DEPARTMENT AT 1-855-962-6943. IN THE UNLIKELY EVENT THAT ECS'S CUSTOMER CARE DEPARTMENT IS UNABLE TO RESOLVE A COMPLAINT YOU MAY HAVE REGARDING A SERVICE OR WEBSITE TO YOUR SATISFACTION (OR IF ECS HAS NOT BEEN ABLE TO RESOLVE A DISPUTE IT HAS WITH YOU AFTER ATTEMPTING TO DO SO INFORMALLY), WE EACH AGREE TO RESOLVE THOSE DISPUTES THROUGH BINDING ARBITRATION OR SMALL CLAIMS COURT INSTEAD OF IN COURTS OF GENERAL JURISDICTION TO THE FULLEST EXTENT PERMITTED BY LAW. ARBITRATION IS MORE INFORMAL THAN A LAWSUIT IN COURT.

ARBITRATION USES A NEUTRAL ARBITRATOR INSTEAD OF A JUDGE OR JURY, ALLOWS FOR MORE LIMITED DISCOVERY THAN IN COURT, AND IS SUBJECT TO VERY LIMITED REVIEW BY COURTS. ARBITRATORS CAN AWARD THE SAME DAMAGES AND RELIEF THAT A COURT CAN AWARD. ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. ECS WILL PAY ALL COSTS OF ARBITRATION, NO MATTER WHO WINS, SO LONG AS YOUR CLAIM IS NOT FRIVOLOUS. HOWEVER, IN ARBITRATION, BOTH YOU AND ECS WILL BE ENTITLED TO RECOVER ATTORNEYS' FEES FROM THE OTHER PARTY TO THE SAME EXTENT AS YOU WOULD BE IN COURT.

[Doc. 37 at 15–16 (emphasis in original)].

Plaintiffs had clear notice of the Terms of Use Agreement, and they affirmatively acknowledged it and assented to it by clicking "Create your Account," which is sufficient to form a contract.  *See, e.g.*, *Abukar v. Experian Info. Sols., Inc.*, No. 22-cv-00855-bhl, 2023 WL 3394827, at *1 (E.D. Wis. April 11, 2023); *Arciniega v. Experian Info. Sols., Inc.*,

No. 23-cv-00245-PHX-SPL, 2023 WL 6803084, at *3 (D. Ariz. Oct. 12, 2023); *Cimillo v. Experian Info. Sols., Inc.*, No. 21-cv-09132-VB, 2023 WL 2473403, at *6 (S.D.N.Y. Mar. 13, 2023).   In addition, the 2024 Arbitration Agreement in force at the inception of the lawsuit contains the same advisement.  [Doc. 37 at 65–66].   Plaintiffs do not dispute that every version of the Terms of Use that was in effect during Plaintiffs' enrollment contained an arbitration agreement.  *See* [Doc. 43]; *see also* [Doc. 37 at 4–5 ¶¶ 6–7].

Plaintiffs suggest that *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016), supports the proposition that "Experian's website not only failed to provide notice sufficient for a finding of assent on the part of the consumer, but that it was also deliberately misleading."  [Doc. 43 at 13].  However, *Sgouros* is not binding on the Court and is also factually distinct from Plaintiffs' case.  In *Sgouros*, the court stated that the defendant's clickwrap agreement process actively misled the customer by neglecting to note anything about assent to contractual terms.  *Sgouros*, 817 F.3d at 1035.  Instead, the agreement merely stated that assenting allowed the defendant to obtain the plaintiff's personal information.  *Id.*  Here, though, the webpage read, "[b]y clicking 'Create Your Account,' I accept and agree to your Terms of Use Agreement, as well as acknowledge receipt of your Privacy Policy" and provided the hyperlink for the Terms of Use Agreement.  [Doc. 37 at 3–4, ¶¶ 3, 4; 8].  The Terms of Use Agreement unequivocally sets forth the Arbitration Agreements, with a summary in all capitals.  [Doc. 37 at 15–16, 65–66].  In *McGuire*, this Court adopted Judge Prose's recommended finding that the CreditWorks clickwrap agreement had "no subterfuge or lack of clarity."  *McGuire*, 2024 WL 3897073, at *16, *report and recommendation adopted*, 2024 WL 4027964 (D. Colo. Sept. 3, 2024).  Other courts have concluded similarly.  *See, e.g.*, *Hanson*, 2024 WL

3509482, at *11.

Plaintiffs each submit declarations in which they state that they "have never clicked anything indicating that [they] agreed to waive [their] right to a jury trial with Experian. Had [they] seen any such indication, [they] would not have signed up for an online Experian account. [Doc. 43-1 at ¶ 2; Doc. 43-2 at ¶ 2]. However, such arguments are insufficient to create a genuine dispute about the existence of a valid and enforceable agreement to arbitrate. Plaintiffs do not dispute that they signed up for an online Experian account through the internet with the screens described by Mr. Smith. *See* [Doc. 43-1 at ¶ 2; Doc. 43-2 at ¶ 2]. Nor do they dispute Mr. Smith's statement that "[a]fter enrolling, Plaintiffs continuously used the service, including after the version of the Terms of Use in effect at the time they filed this lawsuit came into effect." *Compare* [Doc. 37 at 4 ¶ 5], *with* [Doc. 43-1; Doc. 43-2]. In the Tenth Circuit, it is well-established that an individual who fails or declines to read the terms of a contract does not invalidate the contract. *Vernon*, 857 F. Supp. 2d at 1152 ("[Individuals] cannot avoid contractual obligations by claiming that [they] . . . did not read the agreement."); *see also Petrie*, 360 F. Supp. 3d at 1162 ("[G]eneral denials and statements that a user does not recall visiting a website or agreeing to arbitrate are insufficient to defeat arbitration."). And Plaintiffs fail to make any arguments distinguishing their obligations under the 2024 Arbitration Agreement from those under the 2020 Arbitration Agreement. *See generally* [Doc. 43].

Therefore, the Court concludes that a valid arbitration agreement existed and that Plaintiffs assented to it.

## III.    Experian Can Enforce the Arbitration Agreements

The Court next addresses whether Experian can enforce either Arbitration

Agreement against both Plaintiffs.[5]  Experian contends it can enforce both Arbitration Agreements because it is a party to both Arbitration Agreements, or in the alternative, at a minimum, it is a third-party beneficiary to both Arbitration Agreements.  [Doc. 36 at 16–20].  Experian claims it is a party to both Arbitration Agreements because it is an "affiliate" of ECS and the 2020 Arbitration Agreement expressly states "[f]or purposes of this arbitration provision, references to 'ECS,' 'you,' and 'us' shall include our respective parent entities, subsidiaries, affiliates."  [Doc. 36 at 17; Doc. 37 at 16].  The 2024 Arbitration Agreement has a similar provision:

> The term 'ECS' means ConsumerInfo.com, Inc., an Experian company (also known as Experian Consumer Services) and referred to as "Experian" on the Websites, its predecessors in interest, successors and assigns, affiliates (including, but not limited to, Experian Information Solutions, Inc.), agents, employees, and any of its third party service providers (including, without limitation, cloud service providers) who ECS uses in connection with the provision of the Services to you.

[Doc. 37 at 54].  Mr. Smith declares that Experian has been an affiliate of ECS during the entire time Plaintiffs have been enrolled in CreditWorks.  [Doc. 37 at 3 ¶ 2; *id.* at 4 ¶ 6].  He further declares that "[a]t all times relevant to this action, [Experian] contributed to the services that CreditWorks subscribers receive by providing regular access to how information appears in their EIS credit files, including any changes to their credit file information."  [*Id.* at 5 ¶ 8].  This evidence is undisputed, *see generally* [Doc. 43], and provides sufficient support for the proposition that Experian is a party to both Arbitration

---

[5] Experian argues that "by disclosing to users they are agreeing to arbitrate with ECS's affiliates, and requiring affirmative action by Plaintiff to assent to those terms, Plaintiff is bound by the Terms of Use Agreement and its obligation that she arbitrate her claims against EIS."  [Doc. 36 at 17].  Despite Experian's reference only to a single Plaintiff and the use of the pronoun "her," this Court construes Experian's argument to apply to both Mr. and Ms. Columbia, and attributes this mistake to an error in drafting.

Agreements, *see, e.g.*, *Meeks v. Experian Info. Servs., Inc.*, Nos. 21-17023 & 22-15028, 2022 WL 17958634, at *2 (9th Cir. 2022) ("[W]e hold that Experian is a party to the arbitration provision."); *Capps v. JPMorgan Chase Bank, N.A.*, No. 2:22-cv-00806-DAD-JDP, 2023 WL 3030990, at *5 (E.D. Cal. Apr. 21, 2023) (stating that "[m]ultiple district courts have reached the same conclusion" that the both Arbitration Agreements in the Terms of Use at issue here compels arbitration with EIS) (collecting cases).

Plaintiffs present no justification or case law for reaching a conclusion to the contrary. *See generally* [Doc. 43]. Therefore, there is sufficient evidence to establish that Experian was an affiliate during the time Plaintiffs were enrolled in CreditWorks, that Experian is a party to both Arbitration Agreements, and that Experian may therefore enforce both Arbitration Agreements. Accordingly, the Court need not address Experian's alternative argument that it is a third-party beneficiary to the Arbitration Agreements.

## IV. Arbitrability is Delegated to the Arbitrator

Finally, the Court considers whether the dispute at issue is within the scope of claims the Parties agreed to arbitrate. The 2020 Arbitration Agreement contains a broad delegation clause:

> All issues are for the arbitrator to decide, including the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, and the arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable.

[Doc. 37 at 17]. That Arbitration Agreement indicates that the Parties have stated their intent to delegate issues of arbitrability to the arbitrator, not the Court. The 2024 Arbitration Agreement has similar delegation language:

> All issues are for the arbitrator to decide including, but not limited to, (i) all issues regarding arbitrability, (ii) the scope and enforceability of this arbitration provision as well as the Agreement's other terms and conditions, (iii) whether you or ECS, through litigation conduct or otherwise, waived the right to arbitrate, (iv) whether all or any part of this arbitration provision or Agreement is unenforceable, void or voidable including, but not limited to, on grounds of unconscionability, (v) any dispute regarding the payment of arbitration-related fees, (vi) any dispute related to the dispute Notice provisions in subparagraph (b) (above), and (vii) any dispute related to Mass Arbitration (defined below). Pursuant to this agreement, the arbitrator has been delegated with, and possesses, exclusive authority to resolve all of the above-enumerated types of disputes.

[*Id.* at 69]. And as discussed above, Plaintiffs do not dispute that after enrolling, they continuously used the service, including after the version of the Terms of Use in effect at the time they filed this lawsuit came into effect. Any question of whether Plaintiffs' claims are covered by the Arbitration Agreements must be resolved by the arbitrator. *Henry Schein*, 586 U.S. at 68 ("[W]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract . . . even if the court thinks that the arbitrability claim is wholly groundless.").

Based on the analysis contained herein, the Court respectfully grants Experian's Motion to Compel Arbitration. Furthermore, the Court finds that administrative closure of the case pending arbitration is appropriate under Local Rule 41.2. *Talmadge v. Berkley Nat'l Ins. Co.*, 687 F. Supp. 3d 1089, 1094 (D. Colo. 2023) (stating that "when a case would otherwise be stayed for an indefinite amount of time," administrative closure may be appropriate); D.C.COLO.LCivR 41.2.

## CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1)     Defendant Experian Information Solutions, Inc.'s Motion to Compel Arbitration and Supporting Memorandum of Law [Doc. 36] is respectfully **GRANTED**;

(2)     The Parties **SHALL FILE** a joint report regarding the status of arbitration within 30 days of the resolution of the claim in arbitration; and

(3)     Pursuant to D.C.COLO.LCivR 41.2, the Clerk of Court **SHALL ADMINISTRATIVELY CLOSE** the case subject to reopening for good cause, such as after the ruling on arbitrability by the arbitrator or the issuance of the arbitration award, if appropriate.

DATED: August 22, 2025                 BY THE COURT:

                                                  Nina Y. Wang
                                                  United States District Judge